| | | |
|---|---|---|
| BRADFORD BOHANON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02117-JMS-MJD |
| | ) | |
| MICHAEL REIGER, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY

In the early hours of the morning on August 7, 2014, Plaintiff Bradford Bohanon became involved in a confrontation with two police officers while the three were drinking at Mikie's Pub in Indianapolis. The incident left Mr. Bohanon bloodied and unconscious. The Indianapolis Metropolitan Police Department ("IMPD") investigated and then-Chief Rick Hite ultimately concluded that the involved officers, Defendants Michael Reiger and John Serban, should be terminated for their actions. Mr. Bohanon brought suit, alleging several claims stemming from the incident at Mikie's Pub.

Now pending is Defendant City of Indianapolis' ("City") Motion for Summary Judgment, [Filing No. 105], which requires the Court to determine whether the City may be held liable for the officers' alleged violations of Mr. Bohanon's constitutional rights under the theory recognized in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Because genuine issues of fact exist as to whether the IMPD's policies on policing while drinking caused one of Mr. Bohanon's alleged constitutional injuries, the Court **GRANTS IN PART** and **DENIES IN PART** the City's Motion.

# I.
## LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Incident at Mikie's Pub

At approximately one in the morning on August 7, 2014, Officers Reiger and Serban visited Mikie's Pub while off duty. [Filing No. 116-12 at 7; Filing No. 116-13 at 3-5; Filing No. 116-14 at 5.] The officers wore plain clothes and took Officer Reiger's personal vehicle. [Filing No. 116-

3

13 at 3-4; Filing No. 116-14 at 3-4.] Upon arriving, the officers each drank several beers and at least one shot. [Filing No. 116-13 at 5; Filing No. 116-14 at 6; Filing No. 116-14 at 35.]

Sometime after the officers arrived and began drinking, Mr. Bohanon arrived at Mikie's Pub and ordered a double scotch. [Filing No. 116-11 at 11; Filing No. 116-11 at 19.] At some point, Mr. Bohanon ordered a round of shots for the patrons at the bar. [Filing No. 116-11 at 30-31; Filing No. 116-12 at 8; Filing No. 116-15 at 3.]

When Mr. Bohanon received his tab, he believed that he had been overcharged and disputed his bill with the bartender, Andrea Welsh. [Filing No. 116-11 at 30-32; Filing No. 116-12 at 5; Filing No. 116-15 at 3.] Mr. Bohanon requested an itemized receipt, which Ms. Welsh refused. [Filing No. 116-11 at 34-38.] Mr. Bohanon became loud and combative. [Filing No. 116-11 at 34-38; Filing No. 116-12 at 4-5; Filing No. 116-13 at 4; Filing No. 116-14 at 9; Filing No. 116-15 at 3-4.] Ms. Welsh took the bar tab from Mr. Bohanon's hand and told him to leave. [Filing No. 116-12 at 4; Filing No. 116-13 at 5; Filing No. 116-15 at 3.] Instead of leaving, Mr. Bohanon continued to argue with Ms. Welsh over his bar tab. [Filing No. 116-11 at 34-38; Filing No. 116-12 at 4-5; Filing No. 116-13 at 4; Filing No. 116-14 at 9; Filing No. 116-15 at 3-4.] William Harper, the doorman at Mikie's Pub, witnessed the argument and walked up alongside Mr. Bohanon. [Filing No. 116-15 at 2.]

When the situation did not deescalate and Mr. Bohanon continued to refuse to leave, [Filing No. 116-13 at 6], Officer Serban grew concerned for Mr. Harper and Ms. Welsh's safety. [Filing No. 116-4 at 3-4.] Officer Serban approached Mr. Bohanon:

> I [Officer Serban] actually approached him and stood off a distance for a little bit to [sic] because I knew he was being asked to leave and he's becoming increasingly belligerent and I didn't know if he was going to give Bill [Harper] a problem so that's why I watched him for a minute and instead of calming down and leaving because he had briefly stepped away and then walked back to the bar and he just kept getting more and more loud you know do you know who the f**k I am and

then he kept repeating I'm Bradford Scott Bohanon so at that juncture you know this guy's trespassing I know he's not going to leave so (inaudible) identified myself to him.

[Filing No. 116-13 at 7 (redaction added).]  As Officer Serban approached Mr. Bohanon, Officer Reiger followed and stood behind him.  [*See* Filing No. 125 (video footage showing portions of incident).]  This approach, where Officer Serban acted as the "contact officer" and Officer Reiger acted as the "cover officer," is called the "tactical v" and is part of police training on how officers should take police action.  [Filing No. 106-2 at 4; Filing No. 125.]

Officer Serban next identified himself as a police officer to Mr. Bohanon:

I showed my badge and I told him I was a police officer with IMPD.  I said the staff has asked you to leave you know it's time for you to go, you need to go.  I had showed him my badge and then I sat down at the bar because I wanted him to be able to read it.  He's yelling f**k you I don't give a f**k.  He grabs my badge and he threw it on the bar well I mean the floor, but I didn't see where it went and you know he—you know he brought his hand up toward my head and tried to bring my head back and uh at that point it's fine I reach in and I grab him by his—his elbow and I actually tried to bring his shoulder in to control him and put my hand behind his neck as I was trying to spin him toward the door (inaudible) move him or he slipped out of it or he just had a good base on it, but wasn't able to do that and then it escalated.

[Filing No. 116-13 at 7 (redactions added).]

Officer Reiger joined in the confrontation after Mr. Bohanon threw Officer Serban's badge and made contact with his face.  [Filing No. 116-13 at 7.]  Officer Reiger attempted to grab Mr. Bohanon's right arm.  [Filing No. 116-16 at 10.]  Officer Serban threw two punches, striking Mr. Harper with the first and Mr. Bohanon with the second.  [Filing No. 116-4 at 20.]  In the scuffle, Mr. Bohanon was tackled into a pool table.  [Filing No. 116-4 at 26; Filing No. 116-16 at 11; Filing No. 116-17 at 4.]  Officer Serban placed Mr. Bohanon in a choke hold.  [Filing No. 106-4 at 34; Filing No. 116-4 at 24; Filing No. 116-17 at 4-6.]  While Officer Serban continued his choke hold, Officer Reiger placed his knee onto Mr. Bohanon's right thigh and punched Mr. Bohanon several

times in the back of his head. [Filing No. 116-4 at 28-29; Filing No. 116-16 at 17-18; Filing No. 125.]

At some point, the choke hold caused Mr. Bohanon to lose consciousness. [Filing No. 106-4 at 34; Filing No. 116-4 at 24; Filing No. 116-17 at 4-6.] The officers dragged Mr. Bohanon by his feet, face down, out of the pub and into the parking lot. [Filing No. 116-15 at 5-6; Filing No. 125.] Outside, the officers began kicking the still-unconscious Mr. Bohanon in the back and stepping on his face, "grinding his face into the pavement." [Filing No. 116-15 at 4.]

Mr. Bohanon recalls regaining consciousness outside in the alleyway by Mikie's Pub. [Filing No. 106-9 at 7.] After being unable to walk correctly, Mr. Bohanon "vaguely remember[s] crawling" before he was "stomped back onto the ground" and knocked unconscious again. [Filing No. 106-9 at 7.] Mr. Bohanon regained consciousness a second time in the parking lot, when he had the following exchange:

> The next thing I remember was regaining consciousness the second time to find myself sitting on the ground in the parking lot with my back against a white van. As my vision came back into focus, I saw two (2) men in front of me who were leaning over me and out of breath. The taller of the two men stated, "Don't try to run again." I was confused and beat-up, but responded, "I'm one of the good guys." The taller man either replied, "yeah, you sure are" or "yeah, you're a good guy." The shorter of the two men then asked if I, "believed he was a cop now?" I answered, "no" and was then kicked in the head and face. Thereafter, the taller of the two men said, "If you try to report us we will find you." I was then kicked or hit in the head, and knocked unconscious for the third time. That is my last memory of my encounter with the two (2) men on August 7, 2014.

[Filing No. 106-9 at 7.] Around four a.m., Mr. Bohanon regained consciousness a third time, covered in blood and missing cash from his wallet. [Filing No. 106-9 at 7.] Mr. Bohanon picked

up his business cards, which had been scattered about, and returned to his vehicle. [Filing No. 106-9 at 7-8.]

**B.  IMPD Protocols & Procedures**

At the time of the Mikie's Pub incident, IMPD officers, including Officers Reiger and Serban, were required to comply with all IMPD general orders, rules, and regulations. [Filing No. 106-1 at 6.] IMPD orders and rules were disseminated to the police force in several formats, including in electronic format, with a continuously updated database and e-mail distribution; in print, which were always available in each roll call briefing room and additionally posted for at least thirty days; and orally, as supervisors were required to read and review new and revised directives for four consecutive days after their promulgation. [Filing No. 106-1 at 8; Filing No. 106-1 at 36.] General Order ("G.O.") 2.2 required officers to comply with IMPD directives and provided that violations could result in "disciplinary action, up to and including termination." [Filing No. 106-1 at 32.] IMPD had general orders addressing several areas implicated by Officers Reiger and Serban, including use of discretion, substance use, off-duty responsibilities, use of force, incident reporting, and rendering medical aid.

General Order 1.12 sets forth general principles for exercising officer discretion, stating that "[no] single written directive could possibly cover all circumstances." [Filing No. 116-10 at 2.] The order explains that "[o]fficers must exercise discretion in a manner that is consistent with[] . . . [p]ertinent laws and court decisions; [d]irection, supervision, and orders of supervisors; and [d]epartmental written directives, general or special orders." [Filing No. 116-10 at 2-3.]

General Order 3.24, entitled "Substance Abuse Program," categorically prohibited consumption of alcohol while on duty: "Members are prohibited from having any alcohol or other intoxicant or controlled substance in their blood while on-duty, or off-duty while in uniform or

while employed by any employer to perform a security or law enforcement function." [Filing No. 106-1 at 39.] In a separate paragraph, G.O. 3.24 restricted off-duty officers' actions while consuming alcohol: "While off-duty, officers with alcohol in their blood are prohibited from performing any law enforcement function or taking self-initiated police actions except in extreme emergency situations where injury to the officer or another person is likely without law enforcement intervention." [Filing No. 106-1 at 39.] Certain terms from this provision are further defined in IMPD directives. The "Definitions" section of G.O. 3.24 defined "law enforcement function":

> **Law Enforcement Function** - Police actions to include, but not limited to, stopping or detaining a person or vehicle; participating in a pursuit while driving a vehicle; making an arrest; or using physical force capable of causing bodily injury, including deadly force, against any other person except when necessary to prevent injury to the officer or another person; preventing escape of a person who could be prevented from escaping by the use of deadly force; or preventing the destruction of evidence at a crime.

[Filing No. 106-1 at 39.] General Order 3.12, entitled "Off-Duty Responsibilities," defined "extreme emergency":

> An extreme emergency is considered to be a situation where action is required to prevent injury to the off-duty member or another, or to prevent the commission of a felony or other serious offense. Where action is not taken due to the personal nature of the incident, the member should remain available as a witness or to assist in the event of an action by an on-duty officer.

[Filing No. 106-1 at 46; Filing No. 116-6 at 47.] Though G.O. 3.24 and G.O. 3.12 permitted officers to perform police actions while consuming alcohol in the event of an extreme emergency,

officers were neither expected nor required to do so, and received training to that effect.[1] [Filing No. 106-2 at 4.]

General Order 3.24 was implemented in response to a 2010 incident involving former IMPD Officer David Bisard, who crashed into several motorcyclists while intoxicated and on duty, responding to a call. [Filing No. 116-1; Filing No. 116-2 at 12; Filing No. 116-2 at 17.] As IMPD Legal Instructor Officer Michael Daley acknowledged, alcohol impairs officers' "ability to judgment [sic], ability to react. I mean it's very clearly established on [sic] all sorts of science and everything else." [Filing No. 116-3 at 12.] Officer Serban explained that G.O. 3.24 prohibited drinking on duty "[b]ecause they don't want our judgment to be impaired." [Filing No. 116-4 at 42.] Finally, as G.O. 3.24 noted in its prefatory "Policy" section:

> Substance abuse demoralizes and destroys mental thought processes and the job performance of departmental personnel. . . . The purpose of this policy is to ensure members are not under the influence of alcohol or other drugs while acting in any law enforcement capacity. This will ensure officer and citizen safety while eliminating any question as to whether a member's judgment was impaired when the member performed a law enforcement function.

[Filing No. 106-1 at 37.]

---

[1] As the City points out, several of Mr. Bohanon's factual assertions either omit necessary details, misrepresent the record, or otherwise draw an unreasonable inference from the record citation. For two examples: Mr. Bohanon cites to Filing No. 116-6 at 21 for the proposition that "G.O. 3.12 requires an off-duty officer with alcohol in their system to respond to a situation involving an assault." [Filing No. 115 at 5.] But that page of Sergeant McEwen's deposition makes no mention whatsoever of alcohol or G.O. 3.24, and thus wholly fails to support Mr. Bohanon's assertion. Second, Mr. Bohanon cites to Chief Hite's deposition and states that, "[a]ccording to Chief Hite, the fact that Officers Serban and Reiger were off-duty and consuming alcohol was not an issue." [Filing No. 115 at 20 (citing Filing No. 116-2 at 37).] But Chief Hite said nothing of the sort, instead expressing a couple concerns in response to the question: "What aspect of that charging information was pertinent to you and your deliberations as to Officer Reiger and Officer Serban?" [Filing No. 116-2 at 37.]

There are several other instances of less than candid assertions, and the Court cautions Mr. Bohanon's counsel that it expects complete candor going forward. The Court need not belabor the point or address every problematic statement because, drawing only reasonable inferences in Mr. Bohanon's favor from the admissible evidence, the City is nonetheless not entitled to summary judgment on Mr. Bohanon's excessive force *Monell* claim.

Generally, off-duty police officers still held certain responsibilities, as further outlined in

G.O. 3.12:

**POLICY**

An off-duty Indianapolis Metropolitan Police officer is expected to take appropriate action to offenses that occur in their presence. Appropriate action is that which is both necessary, considering the totality of the circumstances, and within their ability to handle at the time (e.g. availability of weapon, radio communication, physical condition, family members present, etc.).
. . .
**PROCEDURE**

    I.     Required Action – Arrests
        A.  While off-duty, members will take proper and lawful action when a situation arises requiring immediate action as a police officer. Members should not take official action or actively participate in:
            1.  Personal disputes; or
            2.  Incidents involving close relatives, associates, or neighbors, except in extreme emergencies.
. . .
    II.    Firearms
        A.  Because it is recognized there are certain occasions when carrying a firearm off-duty would not be practical (i.e., when engaged in a sports activity, when the style of clothing would restrict or preclude the carrying of a firearm, or when the member has prior knowledge of the consumption of alcoholic beverages), carrying a firearm off-duty will be optional to the officer. When off-duty and unarmed, officers will not be subject to disciplinary action should an incident occur where the officer would normally have taken appropriate police action if he had been armed.

[Filing No. 106-1 at 46.]  General Order 3.24 regarding substance use superseded G.O. 3.12 insofar

as G.O. 3.24 limited an off-duty officer's activities while intoxicated.  [*See* Filing No. 106-1 at 34

("In the event of conflicting orders, the most recent order given shall be followed . . . ."); Filing

No. 106-1 at 38 ("As a condition of employment, all employees must abide by the terms of [G.O.

3.24]." (italics omitted)); Filing No. 116-6 at 46.]

Whether on duty or off duty, General Order 1.30 required that officers "use only that amount of force that is reasonable, given the facts and circumstances known by the officer at the time of the event." [Filing No. 106-1 at 49.] The "Policy" section explained that IMPD "considers the use of force in most instances to be defensive in nature and to be used only when necessary and justified to accomplish lawful objectives. All officers shall exercise good judgment at all times when the use of force is necessary." Following the general policy and overview sections were excerpts of relevant state statutes, a discussion of U.S. Supreme Court case law, rules and guidelines for dealing with specific situations, reporting policies, and medical attention policies for injuries sustained in a confrontation. [Filing No. 106-1 at 50-56.]

Another IMPD regulation explained that officers should "only use deadly force when absolutely necessary to protect the life of a citizen or officer when no other options are available." [Filing No. 106-1 at 84.] Additionally, officers must "take proper action when they observe wrongful or negligent behavior by departmental members." [Filing No. 106-1 at 97.]

General Order 1.30 imposed several reporting requirements for use-of-force incidents. An officer was required to "notify a supervisor . . . as soon as practical following a use of force incident . . . resulting in, or alleged to have resulted in, serious bodily injury, injury or complaint of pain of another person." [Filing No. 116-6 at 54.] "Serious bodily injury," in turn, was defined by reference to state statute: "Serious Bodily Injury[] means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." [Filing No. 106-1 at 50 (quoting Ind. Code § 35-41-1-25 (2011), *recodified*, Ind. Code § 35-31.5-2-292 (2017)).] Supervisors were required to investigate all use-of-force incidents and review all officer reports. [Filing No. 106-1 at 55.] Where a supervisor believed

that the use of force did not comply with IMPD policy or could lead to civil litigation, the supervisor was required to initiate an internal investigation and prepare a separate memorandum. [Filing No. 106-1 at 55.]

In addition to notifying a supervisor, the officer was required to create a report, describing the circumstances of the use of force and any injuries to officers or citizens. [Filing No. 106-1 at 54.] The officer was also required to take photos of all injuries and include them in the report. [Filing No. 101-6 at 54.] Within 72 hours of a use-of-force incident, IMPD officers were required to enter electronic reports into a system called "Blue Team." [Filing No. 106-1 at 13.] The system allowed officers to submit reports from the field. [Filing No. 106-1 at 58-78.] The Blue Team reports were transferred up the chain of command for review. [Filing No. 106-4 at 9-10.] The IMPD Professional Standards Division was "responsible for conducting a documented annual analysis of [use-of-force] reports by reviewing the incidents in an effort to reveal patterns or trends that could indicate training needs, equipment upgrades and/or policy modifications." [Filing No. 106-1 at 56.]

Finally, General Order 1.30 required officers to obtain medical assistance for "any person who has sustained visible injury, expressed a complaint of injury, continuing pain or serious bodily injury." [Filing No. 106-1 at 55.] The provision further provided that "[i]f any such individual refuses medical attention, such refusal shall be fully documented in related reports and whenever practical, should be witnessed by another officer and/or medical personnel." [Filing No. 106-1 at 55.]

Officer Reiger received training on all of IMPD's general orders and protocols as part of his initial police training, and Officers Reiger and Serban received further training in the months

before the Mikie's Pub incident.[2]  [Filing No. 106-1 at 3-6; Filing No. 106-2 at 2-3; Filing No. 106-3 at 18.]  For example, officers underwent training on use of force, substance abuse and alcohol, and strangulation in the months before the incident.  [Filing No. 106-2 at 4-5; Filing No. 406-5 at 39-40.]  The strangulation training explained that "strangulation is deadly force under IMPD's directives and Indiana law because it creates a substantial risk of serious bodily injury." [Filing No. 106-2 at 5.]  In June 2014, IMPD officers underwent training on the use of the Blue Team incident reporting system and the need to contact supervisors to perform investigations into use-of-force incidents.  [Filing No. 106-1 at 13-14.]  Officers must annually perform eight to sixteen hours of general in-service training in addition to at least sixteen hours of training specifically addressing firearms and use of force, covering a variety of issues such as contact and cover, de-escalation, and officer survival.  [Filing No. 106-2 at 3; Filing No. 106-3 at 7-9; Filing No. 106-3 at 27-28.] Officers are provided further training during daily roll calls.  [Filing No. 106-2 at 3.]

**C.  IMPD Investigation**

IMPD's Special Investigations Unit ("SIU") investigated Mr. Bohanon's complaint about the incident at Mikie's Pub and determined that there was probable cause to believe that Officers Reiger and Serban committed felony offenses.  [Filing No. 106-1 at 20.]  On September 10, 2014, the Marion County Prosecutor's Office charged each officer with felony battery.  [Filing No. 106-1 at 118-22.]  On September 25, 2014, then-Chief Rick Hite suspended the officers without pay and recommended that they be discharged.  [Filing No. 106-1 at 124-28.]

---

[2] Officer Serban joined IMPD as a result of the Indianapolis Police Department's 2007 merger with the Marion County Sheriff's Department, and thus did not necessarily undergo the same IMPD recruitment and probationary training as Officer Reiger.  [Filing No. 106-1 at 6.]

Following the SIU investigation, IMPD Internal Affairs conducted its own administrative investigation into Mr. Bohanon's allegations. [Filing No. 106-1 at 20.] Internal Affairs concluded that the evidence established that Officers Reiger and Serban:

- Were off-duty and drinking before the incident;

- Used force, "including a choke hold that IMPD does not teach its officers"; and

- Did not call for officer or medical assistance.

[Filing No. 106-1 at 20-21.]

Based upon these factual findings, Internal Affairs concluded that Officers Reiger and Serban:

- Engaged in gross misconduct in violation of IMPD directives;

- Engaged in "egregious . . . and unacceptable" conduct by failing to notify a supervisor, call for medical assistance, and report the incident using Blue Team;

- Disobeyed state and federal laws;

- Failed to cooperate and be truthful during the Internal Affairs investigation;

- Involved themselves, while off duty, in an "incident . . . which did not require police intervention"; and

- Were unfit for continued employment due to their lack of good judgment.

[Filing No. 106-1 at 21.] The lone allegation that Internal Affairs did not sustain was the allegation that the officers stole money from Mr. Bohanon. [Filing No. 106-1 at 21.] Internal Affairs' conclusions and findings were reviewed by both the Commander of the Professional Standards branch and by a designee of the police chief. [Filing No. 106-1 at 21.]

Chief Hite also reviewed the incident and concluded that Officers Reiger and Serban violated several IMPD policies, including use of excessive force, use of an inappropriate choke

hold, failure to render medical aid, failure to notify the supervisor, and failure to document the incident. [Filing No. 106-5 at 41; Filing No. 106-5 at 72-73.]

### D. Procedural History of this Case

Mr. Bohanon brought suit against the City and Officers Reiger and Serban on August 5, 2016, alleging various state law and constitutional claims against each Defendant. [Filing No. 1.] On December 1, 2016, Mr. Bohanon amended his complaint to allege claims against 5135 Holdings, Inc., the owner of Mikie's Pub. [Filing No. 11.] On April 20, 2017, the Court granted 5135 Holdings' Motion to Dismiss, concluding that Mr. Bohanon's claims against 5135 Holdings were time-barred under the applicable statute of limitations. [Filing No. 71.] On July 31, 2017, the Clerk entered default against Officer Reiger, [Filing No. 92], who has since appeared and is proceeding *pro se*, [*see, e.g.*, Filing No. 101].[3] On August 17, 2017, Mr. Bohanon reached a settlement with Officer Serban, and the Court is awaiting the filing of dismissal documents. [Filing No. 96.] On September 8, 2017, the Court dismissed Mr. Bohanon's state law *respondeat superior* claim against the City, [Filing No. 98], pursuant to the parties' joint stipulation, [Filing No. 97]. Only Mr. Bohanon's *Monell* claim under 42 U.S.C. § 1983 is left for adjudication. On October 12, 2017, the City filed the instant Motion for Summary Judgment, [Filing No. 105], which is now fully briefed and ripe for determination.

---

[3] Mr. Bohanon's Motion for Default Judgment against Officer Reiger, [Filing No. 93], remains pending and will be addressed by separate order.

## III.
### DISCUSSION

The City argues that it is entitled to judgment as a matter of law because no reasonable factfinder could conclude that it was deliberately indifferent to Mr. Bohanon's rights or that it had a policy or practice that caused Mr. Bohanon's constitutional injuries.[4] [Filing No. 107 at 24-28.]

Mr. Bohanon devotes most of his discussion to the argument that Officers Reiger and Serban were acting under the color of law, apparently unaware that the City has not argued otherwise.[5] [Filing No. 117 at 22-25.] Mr. Bohanon also argues that IMPD's policies and customs caused Mr. Bohanon's injuries by permitting intoxicated officers to decide when and whether to intervene and use force. [Filing No. 117 at 26-27.] Mr. Bohanon's statement of claims sets forth claims based upon the officers' use of excessive force, unreasonable search and seizure, failure to intervene, and deliberate indifference to medical needs. [Filing No. 99 at 3.] While neither Mr. Bohanon's nor the City's submissions direct specific arguments toward specific alleged constitutional injuries, Mr. Bohanon's brief focuses exclusively on his excessive force claim. [*See* Filing No. 117.]

In reply, the City points out that whether Officers Reiger and Serban acted under the color of law is not at issue. [Filing No. 119 at 13.] The City reiterates its arguments that IMPD's policies were not the cause of Mr. Bohanon's injuries and that it did not have a widespread practice of authorizing police action while intoxicated. [Filing No. 119 at 13-20.]

---

[4] The City also argues that it is entitled to summary judgment because Mr. Bohanon "failed to disclose a factual basis for his claims." [Filing No. 107 at 28-31.] Apparently satisfied with Mr. Bohanon's response on this point, the City does not renew or mention this argument in reply and, in any event, the Court finds that the statements of the eyewitnesses and the footage of the Mikie's Pub incident provide ample notice of the basis for Mr. Bohanon's claims.

[5] Indeed, the word "color" and the phrase "color of law" do not even appear in the City's opening brief. [*See* Filing No. 107.]

The Supreme Court in *Monell* held that municipalities may be sued under 42 U.S.C. § 1983 when their actions violate the Constitution. 436 U.S. 658 (1978). The Court limited this liability to actions that may be attributed to the municipality itself: "a municipality cannot be held liable solely because it employs a tortfeasor . . . on a *respondeat superior* theory." *Id.* at 691. *Monell* "expressly le[ft] further development of this action to another day," *id.* at 695, and subsequent cases have elaborated upon and clarified when municipalities may be held liable for constitutional violations.

In *Board of the County Commissioners v. Brown*, the Court canvassed its decisions applying *Monell* and distilled the legal theory to three elements: First, the plaintiff must identify an action attributable to the municipality itself. 520 U.S. 397, 403-04 (1997). *Brown* and other cases have identified three ways in which a municipality may "act": written policies; widespread practices or customs; or other actions by a final decision maker. *Id.* Second, the plaintiff must demonstrate that the "municipal action was taken with the requisite degree of culpability," *id.* at 404—specifically, that the "action was taken with 'deliberate indifference' as to its known or obvious consequences," *id.* at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Finally, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

The parties agree that Officers Reiger and Serban were governed by written policies in the form of IMPD directives, including G.O. 3.24 concerning substance abuse and consumption of alcohol. The parties dispute whether IMPD's policies and/or practices reflected deliberate indifference and caused Mr. Bohanon's injuries.

"[Q]uestions of causation and deliberate indifference often overlap." *Wilson v. Cook Cty.*, 742 F.3d 775, 782 n.1 (7th Cir. 2014). The high likelihood that a municipality's policy could result

in constitutional violations may both reflect "deliberate indifference to the obvious consequence" of the policy and yield "an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Brown*, 520 U.S. at 409-10. Cases which do not involve "an allegation that the municipal action itself violated federal law, . . . present much more difficult problems of proof" of these elements than cases involving facially unconstitutional actions. *Id.* at 406.

This case falls into the "difficult problems of proof" category. Mr. Bohanon does not argue that G.O. 3.24 or any other directive facially violates the Constitution (i.e. by mandating discriminatory conduct or excessive force). Rather, Mr. Bohanon argues that his rights were violated because it was clear from the IMPD's policy choice that such violations would occur. Mr. Bohanon's problems of proof are made all the more challenging by the absence of evidence of "a pattern of tortious conduct" that would make the insufficiency of G.O. 3.24 obvious to IMPD. *Id.* at 408. The only incident to which Mr. Bohanon points is the Officer Bisard incident in 2010. Notwithstanding Mr. Bohanon's suggestion that G.O. 3.24 was an insufficient response to the Officer Bisard intoxicated driving incident, the Bisard incident predated G.O. 3.24, and thus could not serve as notice of a problem with that particular policy.

However, a "difficult problem of proof" does not equate to an insurmountable wall, and the Seventh Circuit's recent *en banc* opinion in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017), demonstrates why the City is not entitled to judgment as a matter of law on Mr. Bohanon's excessive force *Monell* claim. *Glisson* involved a deliberate indifference *Monell* claim brought by the estate of Glisson, a chronically ill inmate who died while in custody. 849 F.3d at 373-74. The basis of the plaintiff's claim was that Corizon, the medical provider at the prison, caused Glisson to receive constitutionally deficient care for his chronic and serious

medical conditions because it failed to have a medical coordination policy. *Id.* at 375-76. Instead, care decisions were left to the myriad individual medical professionals at the prison—"no one was responsible for coordinating [the plaintiff's] overall care," and "no provider developed a medical treatment plan." *Id.* Thirty-seven days after arriving at the prison, Glisson died from a variety of causes that could have been remedied if appropriately addressed. *Id.* at 373.

The Seventh Circuit examined Corizon's lack of a coordinated care policy and explained that a "hands-off policy is just as much a 'policy' as the 100% enforcement policy is." *Id.* at 382. The court held that a reasonable jury could infer deliberate indifference and causation from this policy decision based upon two grounds. First, the estate submitted evidence showing that Corizon had access to, but declined to adopt, the Indiana Department of Corrections' "Chronic Disease Intervention Guidelines," which "specifically mandates a treatment plan for chronic cases." *Id.* at 380. This fact, the court said, was "evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took," which "may or may not have led to a constitutional violation." *Id.*

Second, the court observed that "[o]ne does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care." *Id.* at 382. It was "certain" that Corizon would treat chronically ill inmates and "obvious" that protocols of some sort were required to properly treat those inmates. *Id.* The court concluded that, "in the final analysis, . . . a jury could reasonably find that Corizon's policymakers were deliberately indifferent to the need for such protocols, and that the absence of protocols caused Glisson death." *Id.* (internal quotation and alteration omitted). The court remanded the estate's claims for trial. *Id.*

The parallels between this case and *Glisson* likewise require that Mr. Bohanon's claims be decided at trial. As an initial matter, Mr. Bohanon is correct that G.O. 3.24 vested in officers the

ability and responsibility for deciding when and if an "extreme emergency" existed, such that the officers could intervene and use force despite being intoxicated. And G.O. 3.12 in turn defined an extreme emergency as any situation "where action is required to prevent injury to . . . another." [Filing No. 106-1 at 46.] As Officer Serban testified at his criminal trial for the underlying incident, "Mr. Bohanon became more and more agitated to the point where I thought he actually might be a physical threat to Mr. Harper and possibly to Ms. Welsh," [Filing No. 116-4 at 4]—in other words, Officer Serban believed that his actions were required to prevent injuries to others. The City makes much of its argument that Mr. Bohanon's actions did not in fact create an "extreme emergency" to justify the officers' actions under G.O. 3.24, citing the video footage of the incident in support. [Filing No. 119 at 16.] But even if the Court were to fully agree with the City that the officers were not permitted by G.O. 3.24 to engage Mr. Bohanon while intoxicated (and in fact it appears that Mr. Bohanon has also agreed with that assessment, [Filing No. 106-7 at 85-86]), the City's argument misses the mark. This is because the crux of Mr. Bohanon's claim is not that the officers' compliance or noncompliance with G.O. 3.24 necessarily violated his constitutional rights, but that G.O. 3.24 permitted officers to make pivotal decisions about intervening and using force while intoxicated.

To borrow the phrase used in *Glisson*, "[o]ne does not need to be an expert" to expect that intoxicated officers assessing a situation pursuant to G.O. 3.24 may mistakenly conclude that action is required to prevent injury to another, and therefore place themselves on duty even when doing so would be inappropriate. 849 F.3d at 382. One also does not need to be an expert to know that an intoxicated officer may be far more likely to use greater force than necessary in a physical engagement. Moreover, as in *Glisson*, where Corizon was aware that chronically ill inmates may require care coordination, here IMPD was aware of the dangers of policing while intoxicated. Mr.

Bohanon has designated evidence, including text from G.O. 3.24, showing that IMPD was aware that alcohol impairs an officer's judgment.  [*E.g.*, Filing No. 106-1 at 37 ("[G.O. 3.24] will ensure officer and citizen safety while eliminating any question as to whether a member's judgment was impaired . . ."); Filing No. 116-3 at 12 ("[Alcohol impairs the] ability to judgment [sic], ability to react.  I mean it's very clearly established on all sorts of science and everything else.").]

A reasonable juror could consider the nature of this risk and conclude that the IMPD made a "deliberate choice" to allow intoxicated officers to decide when it is appropriate to engage and that this policy choice constituted deliberate indifference to the likelihood of inappropriate police intervention.  *Glisson*, 849 F.3d at 382.  A reasonable jury could also conclude that this policy choice caused Mr. Bohanon's excessive force injuries when the officers mistakenly decided to intervene based upon the belief that Mr. Harper and Ms. Welsh were in danger.  "*Monell* requires no more."  *Id.*

As in *Glisson*, the Court is "not holding that the Constitution or any other source of federal law required" IMPD to adopt a particular policy, such as Mr. Bohanon's proposed "zero tolerance" policy.  *Id.*  And, returning to the difficulties of proving Mr. Bohanon's claim, the City will be able to introduce evidence at trial to show that G.O. 3.24 was not promulgated with deliberate indifference to the possibility of excessive force incidents.  *See id.* ("At trial, there is no reason why Corizon would not be entitled to introduce evidence of its track record . . . .").  So too will the City be entitled to introduce evidence showing that it was not its policy that caused Mr. Bohanon's injuries, but instead the unreasonable and unnecessary actions of Officers Reiger and Serban, who the IMPD found violated multiple directives.  In holding that the City is not entitled to summary judgment on these issues, the Court concludes only that Mr. Bohanon's *Monell* claim based upon excessive force is not amenable to summary resolution.

The same is not the case, however, for the other claims listed in Mr. Bohanon's statement of claims. [Filing No. 99 at 2.] These include failure to intervene, illegal seizure, and deliberate indifference to medical needs. Mr. Bohanon fails to address these claims in his response brief, and the Court concludes that they fail as a matter of law. First, as to the failure to intervene claim, Mr. Bohanon has provided no evidence suggesting that IMPD has a policy or practice of instructing officers not to intervene. Indeed, this legal theory runs directly counter to the excessive force theory, asserting that IMPD has a policy of excessive and unnecessary intervention, on which the Court must deny summary judgment. Second, Mr. Bohanon has neither explained how nor provided any evidence to suggest that the alleged illegal seizure of cash from his wallet and deliberate indifference to his medical needs following the Mikie's Pub incident were caused by G.O. 3.24 or any other policy or practice. Unlike with the excessive force claim, it is far less obvious that intoxication would cause an officer to steal cash or fail to call for emergency medical attention. Mr. Bohanon has provided no argument or evidence on his *Monell* claims based upon a failure to intervene, illegal seizure, and deliberate indifference to medical needs, and the Court therefore concludes that the City is entitled to summary judgment on each of them.

## IV.
### CONCLUSION

Genuine issues of material fact exist precluding summary judgment on Mr. Bohanon's excessive force *Monell* claim against the City. Mr. Bohanon's other *Monell* theories lack evidentiary support and therefore fail as a matter of law. Therefore, the Court **GRANTS IN PART** and **DENIES IN PART** the City's Motion for Summary Judgment [105]. The Court will set a trial date and related deadlines by separate order.

Date: 1/17/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution:**

MICHAEL REIGER
2424 N. Hideaway Dr.
Indianapolis, IN 46268

Erin A. Clancy
KIGHTLINGER & GRAY LLP
eclancy@k-glaw.com

Daniel Kyle Dilley
DILLEY & OAKLEY, P.C.
d.dilley@dilley-oakley.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
ard@rucklaw.com

Edward C. Harcourt
KIGHTLINGER & GRAY LLP
eharcourt@k-glaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com

Steven Michael Lutz
CHURCH CHURCH HITTLE & ANTRIM
lutz@cchalaw.com

Robert M. Oakley
DILLEY & OAKLEY PC
firm@dilley-oakley.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
lroberts@cchalaw.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov