UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRADFORD BOHANON,                )
                                 )
            Plaintiff,           )
                                 )
      v.                         )        No. 1:16-cv-02117-JRS-MJD
                                 )
CITY OF INDIANAPOLIS,            )
                                 )
            Defendant.           )

**Entry on Post-Trial Motions**

On August 7, 2014, off-duty police officers Michael Reiger and John "Nick" Serban

of the Indianapolis Metropolitan Police Department ("IMPD") used unreasonable

force against Bradford Bohanon when they battered him at Mikie's Pub.  The officers

each had drunk several beers and at least one shot of alcohol before the incident with

Bohanon.  Bohanon brought federal civil rights claims under 42 U.S.C. § 1983 against

the City of Indianapolis (the "City"), claiming, among other things, that it was liable

for the unreasonable force Reiger and Serban used against him under *Monell v. De-*

*partment of Social Services of City of New York*, 436 U.S. 658 (1978) because it had a

policy of allowing off-duty officers with alcohol in their blood to decide when it is ap-

propriate to engage in police action.[1]

The City contended that it was not liable because its policies did not cause Reiger

and Serban to use unreasonable force against Bohanon.  The City asserted instead

that it required its officers to comply with IMPD's directives, which allowed officers

---

[1] Bohanon also sued Reiger and Serban; those claims were resolved before trial.

to use only an amount of force that is reasonable, given the facts and circumstances known by the officers at the time they use force.  The City further argued that under IMPD's directives, off-duty officers with alcohol in their blood were prohibited from performing any law enforcement function or taking self-initiated police actions except in extreme emergency situations.  The case was tried to a jury, which found in favor of Bohanon and against the City, awarding Bohanon $1,241,500 in compensatory damages.

The parties' post-trial motions come before the Court.  The City has filed a Motion for Judgment as a Matter of Law and a Motion for New trial or to Amend Judgment. Bohanon has filed motions for attorney fees and expenses.  The Court decides as follows.  The Court states the facts in the light most favorable to the jury's verdict.  *See Martin v. Milwaukee Cnty.*, 904 F.3d 544, 547 n.1 (7th Cir. 2018).

## I. Factual Background

### A. The Use of Unreasonable Force

In the early morning hours on August 7, 2014, off-duty police officers Reiger and Serban of the IMPD used unreasonable force against Bohanon when they battered him at Mikie's Pub.  The officers each had drunk several beers and at least one shot of alcohol before the incident with Bohannon.

When Bohanon was given his tab, he disputed the amount with the bartender, Andrea Welsh.  Bohanon became loud and argumentative.  (Trial Tr. vol. 1, 100.) Bill Harper, the bouncer, asked Bohanon to leave.  Bohanon became belligerent and began calling the bartender names.  (Trial Tr. vol. 2, 236.)  The evidence showed that

Bohanon, though perhaps loud, never physically threatened the bar tender.  Indeed, Harper appeared to have deescalated the situation.  (Trial Tr. vol. 2, 181.)

In response, Serban moved to the corner of the bar to observe and then approached Bohanon, coming within several inches of and facing him.  (Trial Tr. vol. 1, 100; Trial Tr. vol. 2, 235.)  Reiger took up a position behind Serban in the safety triangle as a "cover officer."  (Trial Tr. vol. 2, 204.)  Serban pulled out his badge and momentarily stuck it in Bohanon's face, identifying himself as a police officer and told Bohanon to leave.  (Trial Tr. vol. 1, 100; Trial Tr. vol. 2, 238.)  Serban tried to pull Bohanon away from the bar, and Bohanon struck Serban in the face.  (Trial Tr. vol. 2, 253.)  Harper moved toward Serban, and Serban struck Harper and then Bohanon.  (Trial Tr. vol. 2, 255.)

Bohanon was backed up against a pool table.  (Trial Tr. vol. 2, 256.)  At one point, Reiger was holding Bohanon's right arm and grabbed his leg, Harper was applying strikes to Bohanon's left arm, and Serban was applying a chokehold to Bohanon.  (Trial Tr. vol. 2, 257–58.)  Then Bohanon, Serban, and Reiger all fell to the ground.  (Trial Tr. vol. 2, 267)  Reiger did not feel any movement from Serban who was on the bottom of the pile.  (*Id.* at 268–69.)  Harper approached the pile, according to Reiger, coming at Reiger with a billy club in hand.  (*Id.* at 269.)  Reiger struck Bohanon five times and Serban also struck Bohanon, all while Bohanon was not moving and, based on the video of the incident, appeared to be unconscious from the chokehold.  (*Id.* at 267, 271; Trial Tr. vol. 1, 127, 128.)  Reiger grabbed Bohanon by the ankles and dragged him out of Mikie's Pub on his face.  (Trial Tr. vol. 2, 272.)  Reiger testified

3

that he "didn't care how [he] got Bohanon off of Officer Serban at the time as long as he [Serban] wasn't being hurt." (*Id.*)  Reiger admitted that dragging a person out on their face can cause some pain.  (*Id.* at 273.)  Once outside, Reiger and Serban dragged Bohanon across the concrete and into the parking lot.  And they continued to batter him even though he was unconsious.

Both Reiger and Serban did not return to work as IMPD officers after the incident involving Bohanon.  The chief of police recommended Serban's termination from his employment based on his violations of IMPD's rules, regulations, orders, and policies and based on his battery of Bohanon in violation of federal, state, or local laws.  However, Serban was allowed to retire in lieu of termination.  (Trial Tr. vol. 2, 172–74, ECF No. 230.)  Reiger was also recommended for discharge, and the merit board terminated his employment based on his violations of General Order 3.1, 3.12, and 3.24.  (Trial Tr. vol. 2, 281–82, ECF No. 230; Trial Ex. 36.)  Reiger and Serban were charged with but acquitted of felony offenses.

### B.  IMPD's Policies

At the time of the incident at Mikie's Pub, IMPD's general orders applied to all department personnel.  Specifically, General Order 2.2 required officers to comply with IMPD directives,[2] including general orders—"Department personnel are accountable for all material contained in the written directives relevant to their job function, responsibilities, and assignment," (Trial Ex. 5, 1)—and provided that violations may result in "disciplinary action, up to and including termination," (*id.*).

---

[2] A directive is "[a]ny communication, whether oral or written, used to guide or affect the performance of conduct of department personnel."  (Trial Ex. 5 at 1.)

Personnel were further advised that "[v]iolations of directives including rules, regulations, general orders . . . may be considered sufficient cause for disciplinary action, up to and including termination." (Trial Ex. 5, 1.)  General Order 2.2 stated that "[i]n the event of conflicting orders, the most recent order given shall be followed, unless retracted or modified." (Trial Ex. 5, 3.)

General Order 1.12, which established guides for the use of discretion and became effective on January 1, 2007, provided that "[no] single written directive could possibly cover all circumstances involving officer discretion." (Trial Ex. 2.)  The order further provided that "[o]fficers must exercise discretion in a manner that is consistent with[]. . . [p]ertinent laws and court decisions; [d]irection, supervision, and orders of supervisors; and [d]epartmental written directives, general or special orders." (*Id.*)

General Order 1.30 provided officers with guidelines for the use of force:  "It is the policy of the department that officers shall use only that amount of force that is reasonable, given the facts and circumstances known by the officer at the time of the event." (Trial Ex. 3, 1.)  The policy section also stated that IMPD "considers the use of force in most instances to be defensive in nature and to be used only when necessary and justified to accomplish lawful objectives.  All officers shall exercise good judgment at all times when the use of force is necessary." (*Id.*)  After the general policy, purpose and scope sections, the general order set forth relevant state statutes, a discussion of U.S. Supreme Court case law, rules and guidelines for dealing with specific situations, reporting policies, medical attention for injuries sustained using force, supervisor responsibility, and annual analysis. (Trial Ex. 3, 2–8.)  General

Order 1.30 quoted language from Indiana law: "[a] person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. . . . No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." (Trial Ex. 3, 2 (quoting then Ind. Code § 35-41-3-2(a).)

The general order also advised officers as to when they were justified in using deadly force: a person is justified in using deadly force "if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." (Trial Ex. 3, 2 (quoting then Ind. Code § 35-41-3-2(a).) "Deadly force" was defined as "[f]orce that creates a substantial risk of serious bodily injury." (*Id.* (quoting Ind. Code § 35-41-1-7).) General Order 1.30 required officers to "notify a supervisor . . . as soon as practical following a use of force incident . . . as described below: . . . 3. Force applied resulting in, or alleged to have resulted in, serious bodily injury, injury or complaint of pain of another person." (Trial Ex. 3, 6.) The general order also required officers "to immediately report" to a supervisor "all violations of department policies, procedures, rules and regulations and directives regarding the use of force by another officer[.]" (*Id.* at 1; *see also* Trial Tr. vol. 1, 112–13.) General Order 1.30 became effective on July 6, 2012.

General Order 3.12 on off-duty responsibilities set forth the following policy:

> An off-duty Indianapolis Metropolitan Police officer is expected to take appropriate action to offenses that occur in their presence. Appropriate action is that which is both necessary, considering the totality of the circumstances, and within their

> ability to handle at the time (e.g. availability of weapon, radio communication, physical condition, family members present, etc.).

(Trial Ex. 6, 1.)  The general order required officers to "take proper and lawful action when a situation arises requiring immediate action as a police officer." (*Id.*)  However, an off-duty officer who is not armed is not required to take police action.  (Trial Tr. vol. 1, 112.)  In addition, the order provided that an off-duty officer "should not take official action or actively participate in: (1) Personal disputes; or (2) Incidents involving  close  relatives, associates, or neighbors, except in extreme emergencies." (Trial Ex. 6, 1.)  An "extreme emergency" was defined as "a situation where action is required to prevent injury to the off-duty member or another, or to prevent the commission of a felony or other serious offense."  (Trial Ex. 6, 1.)  Thus, General Order 3.12 allowed off-duty officers to take proper and lawful action in extreme emergencies, including a situation where action is required to prevent injury to the officer or another person.  The order further required off-duty officers to "make [an] incident report if they are directly involved in the action." (*Id.* at 2.)  However, off-duty officers had "the option of . . . calling for an on-duty officer to make the report" instead. (*Id.*)  General Order 3.12 took effect January 1, 2007.

General Order 3.24, entitled "Substance Abuse Program," became effective February 16, 2011, and categorically prohibited consumption of alcohol while on duty and restricted the actions of off-duty officers who had alcohol in their blood.  (Trial Ex. 7, 3.)  General Order 3.24 stated an express purpose:

> The purpose of this policy is to ensure members are not under the influence of alcohol or other drugs while acting in any law enforcement

capacity.  This will ensure officer and citizen safety while eliminating any question as to whether a member's judgment was impaired when the member performed a law enforcement function.

(Trial Ex. 7, 1.)  The order directed: "While off-duty, officers with alcohol in their blood are prohibited from performing any law enforcement function or taking self-initiated police actions except in extreme emergency situations where injury to the officer or another person is likely without law enforcement intervention." (Trial Ex. 7, 3.)  "Law enforcement function" was defined as "[p]olice actions to include, but not limited to . . . using physical force capable of causing bodily injury, including deadly force, against any other person except when necessary to prevent injury to the officer or another person . . . ." (Trial Ex. 7, 2.)  General Order 3.24 superseded General Order 3.12 to the extent there was a conflict between the two orders.  (Trial Ex. 5, 3 ("In the event of conflicting orders, the most recent order given shall be followed . . . ."); *see also* Trial Ex. 7, 1 ("As a condition of employment, all employees must abide by the terms of this [General Order].") (italics omitted).)

Sergeant Michael Daley, a former legal instructor at the IMPD Training Academy, testified that at the training academy, officers learn about the general orders and are tested on them.  (Trial Tr. vol. 1, 118–19.)  Officers are given guidance and training regarding the factors set forth in General Order 1.30 and the use of force.  (*Id.* at 81–82, 111.)  Officers have to show that they understand proper applications of the use of force.  (*Id.* at 119.)  From the training academy, officers attend a field training officer program which includes on-the-job training with another officer.  (*Id.* at 82.)  If an officer successfully completes the field training officer program, then they have

a probationary year where their supervisor audits them at least once a month to re-
view their decision-making and use of force. (*Id.* at 83.) After the probationary year,
officers are required to receive annual use-of-force training. (*Id.*) Officers are trained
on recognizing the threat of injury and differentiating situations that have the poten-
tial for injury versus serious bodily injury. (*Id.* at 84–86.) Officers are provided train-
ing in the training academy and through in-service training about the effects of alco-
hol on a person and going on duty or taking police action while alcohol is in their
system. (Trial Tr. vol. 1, 89–91.) Officers are trained that if they have alcohol in their
blood, they do not take police action. (Trial Tr. vol. 3, 481.)

Officers are also trained that they have to follow the general orders and that if
they violate those orders, they will be disciplined. (Trial Tr. vol. 1, 120.) Sgt. Daley
testified that even officers who are intoxicated or under the influence of alcohol still
have to follow IMPD's general orders, rules, and regulations. (Trial Tr. vol. 1, 95.)
Lieutenant Eli McAllister testified that IMPD expects its officers to comply with and
follow all of the general orders at the same time. IMPD's policy is comprised of the
general orders, rules, and regulations as a whole. (Trial Tr. vol. 3, 466–67.)

Reiger had been working as a police officer since 1992; Serban had been a police
officer since 1998. Before the incident involving Bohanon, both Reiger and Serban
received extensive law enforcement training on the use of force, IMPD's directives,
and state and federal law. Among other training, they had recruit training at IMPD's
Law Enforcement Training Academy and were trained as Field Training Officers. As
Field Training Officers, they had to know IMPD's general orders. To be sure, all

IMPD officers are required to have a working knowledge of the general orders and are required to follow them whether on or off duty. Both Reiger and Serban had use-of-force training at least twice a year, in which they were trained on when it is reasonable to use force, including deadly force, under federal and state law. Both of them had completed strangulation training as well. (Trial Tr. vol. 1, 116, 117–18.) Strangulation and chokeholds are considered deadly force under Indiana law. (*Id.* at 111, 116–17.) In addition, Reiger and Serban had completed Blue Team training, during which they received a refresher course on General Order 1.30, which governs the use of force. (Trial Tr. vol. 1, 116, 117–18.) Thus, during Blue Team training they were trained again on General Order 1.30 and the use of force.

Although Reiger first testified that his understanding was that unless he was intoxicated, he had an obligation to intervene in a situation that might require immediate police action, (Trial Tr. vol. 2, 210–11), he later agreed that General Order 3.24 prohibited off-duty officers with alcohol in their blood from taking any law enforcement or police action except in extreme emergency situations where injury to the officer or another person is likely without law enforcement intervention. (Trial Tr. vol. 2, 211–12, 251.) Reiger also agreed that he had alcohol in his blood at the time of the incident with Bohanon. (*Id.* at 212.) Serban understood that it would generally be inadvisable for an off-duty officer who had been consuming alcohol to intervene in a situation that might require police intervention. (Trial Tr. vol. 2, 160.) At the time of the incident, Reiger and Serban were not on duty. (Trial Tr. vol. 2, 164.)

10

Serban testified that IMPD provided guidance and instruction on alternative measures for off-duty officers to take instead of taking self-initiated police action with alcohol in their system. (Trial Tr. vol. 2, 168, 170.) That was a "common topic," and Serban explained that if an officer was observing a situation and did not believe it was an exigent situation, "and that it may be a stable situation until other officers can arrive, then the course of action is to be a good witness, good observer so [the officer] can present that information to officers when they arrive on the scene." (Trial Tr. vol. 2, 168.) Serban said that if he could have called an on-duty officer, he was encouraged to do as an IMPD officer. (Trial Tr. vol. 2, 182.) Reiger also stated that he was trained that contacting an on-duty officer was the preferred action over inter-vening in a situation as an off-duty officer. (Trial Tr. vol 2, 215–16.) Reiger said that he probably would not have contacted an on-duty officer before engaging Bohanon because he saw no reason to do so until Serban was falling backwards. (Trial Tr. vol. 2, 217–18.)

Serban understood that the purpose of General Order 3.24 was to ensure that officers are not taking police action when they are under the influence of drugs or alcohol. (Trial Tr. vol. 2, 168–69, 183.) Reiger likewise understood that IMPD made it an important priority to ensure that all officers were trained on substance abuse and that the purpose of General Order 3.24 was to ensure that officers were not under the influence while acting in a law enforcement capacity. (Trial Tr. vol. 2, 249–50.)

Serban testified that he believed he was not in violation of General Order 3.24 in performing a law enforcement function because he believed the situation involving

Bohanon was an extreme emergency situation.  (Trial Tr. vol. 2, 164, 190–91.)  He further explained, however, that he "believed . . . it *had the potential to become* an extreme emergency," (Trial Tr. vol. 2, 164 (emphasis added)), and that he "thought it was going to be an impending battery against Bill Harper and/or Andrea Welsh," but he acknowledged that merely thinking that a battery might happen did not rise to the level of an extreme emergency, (*id.* at 191).

Reiger testified that before the physical altercation occurred and Serban was assaulted, there was no extreme emergency situation.  (Trial Tr. vol. 2, 252.)  Reiger testified that he thought he and Serban were "in policy" because Serban had been assaulted.  (Trial Tr. vol. 2, 247, 252.)  Reiger added that he would take a write-up for saving Bohanon and Serban, explaining that if Serban was wearing a gun and Bohanon got a hold of it, it could have gone off, killing Reiger, Serban, Bohanon, and Welsh.  (Trial Tr. vol. 2, 247, 252–53.)

### C.  *Policy Violations*

The evidence at trial established that neither criminal trespass nor resisting law enforcement is an extreme emergency situation.  (Trial Tr. vol. 1, 120–21.)  No extreme emergency situation presented itself at Mikie's Pub on August 7 until, at the earliest, the point in time when Serban initiated force against Bohanon.  (*Id.* at 121 (Sgt. Daley's testimony); *see also* Trial Tr. vol. 3, 468 (Lt. McAllister's testimony that before Serban had choked Bohanon, the video of the incident showed nothing that would lead an officer to determine, based on IMPD rules, regulations, and general orders, that there was an extreme emergency); Trial Tr. vol. 2, 252 (Reiger's

testimony that before Bohanon assaulted Serban, there was no extreme emergency).) Instead, Bohanon merely presented as an intoxicated, belligerent individual at a bar at 3 a.m. (*Id.*)

Reiger testified that he was aware that under General Order 1.30 force was to be used only when necessary and justified. (Trial Tr. vol. 2, 274, 275.) He admitted that he violated the general orders, specifically including General Order 3.24, which prohibited drinking alcohol and taking police action, (Trial Tr. vol. 2, 247, 275–76), and General Order 1.30, which required Reiger and Serban to call a supervisor to the scene, when they did not, (Trial Tr. vol. 2, 277–78).

Sergeant John Green of the IMPD testified that the officers' use of force on Bohanon was criminal conduct. (Trial Tr. vol. 2, 433–34.) When asked based on his thirty years of experience and training and review of the video of the incident, whether Serban's conduct was consistent with IMPD general orders, rules, and regulations, Green answered: "Absolutely not." (Trial Tr. vol. 2, 423, 435.) Green also testified that Reiger's conduct was "[a]bsolutely not" consistent with IMPD general orders, rules, and directives. (*Id.* at 435.)

Lt. McEwen testified that any time an off-duty officer takes police action, he is required to file a report, and every use of force requires a report to be made, in part so IMPD can identify problems and frequency of occurrence. Had Reiger and Serban complied with IMPD rules and regulations, they would have remained on the scene and called for a supervisor, and the supervisor would have investigated the incident and could have determined if the officers were intoxicated. (Trial Tr. vol. 2, 441.) But

13

Reiger and Serban violated policy by not calling for a supervisor and by not making a report; as a result, there was no on-scene investigation.  (Trial Tr. vol. 2, 441.)  Sgt. Green, who is assigned to the Special Investigations Unit that investigates allegations of criminal conduct by an officer, was unaware of any "serious violations of the use-of-force policy prior to" the incident involving Bohanon.  (Trial Tr. vol. 2, 419, 438.)

Sgt. Daley testified that Serban violated the policies by engaging with Bohanon as a police officer over a dispute about a bill.  Serban was trained that if he believed the situation called for police action, he should have called call 911, advised that he was an off-duty officer, and requested officers to respond.  (Trial Tr. vol. 1, 100.)  Serban took impermissible police action by moving close to Bohanon into a position where he would be able to use force on Bohanon and by identifying himself as a police officer (by shoving his badge in Bohanon's face).  (*Id.* at 101.)  Serban's actions escalated the situation.  (*Id.* at 101, 124.)  Reiger took action in violation of the policies by engaging in law enforcement action by a cover contact system or tactical "V" when he had been drinking alcohol.  (*Id.* at 102–05.)

A vascular neck restraint or chokehold can render a person unconscious.  (Trial Tr. vol. 2, 185.)  Reiger understood that force that has the likelihood of causing serious bodily injury is considered deadly force under Indiana law.  (Trial Tr. vol. 2, 263.)  IMPD does not train officers to use chokeholds against suspects.  (*Id.* at 266.)  Serban agreed that if Bohanon was unconscious it would have been important to call a medic, an on-duty officer, and a supervisor, and Serban would have had to complete a Blue

14

Team report.  (*Id.* at 185–86.)  As the videotape of the incident clearly demonstrated, Bohanon was rendered unconscious.

## II. Discussion

### A.  Legal Standard

The City moves for judgment as a matter of law.  Under Federal Rule of Civil Procedure 50, a district court may grant a motion for judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *see also J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc).  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).  If a party files a timely renewed motion for judgment as a matter of law "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

In considering a Rule 50(b) motion, the court must "construe the trial evidence strictly in favor of the party who prevailed before the jury." *Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018) (quotations omitted).  The court does "not reweigh the evidence, assess the credibility of any trial witness, or otherwise attempt to usurp the jury's role as factfinder." *J.K.J.*, 960 F.3d at 378.  Thus, although the court reviews the entire record, it "must disregard all evidence favorable to the

moving party that the jury was not required to believe." *Passanti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (quotations omitted).

Bohanon responds to the City's Rule 50(b) motion by first asserting that many of the City's arguments go beyond the scope of the grounds advanced in its Rule 50(a) motion for judgment as a matter of law and were forfeited. (Br. Opp'n Def's Mot. J. Matter Law, 3, ECF No. 220.) Yet Bohanon's forfeiture argument fails to identify any argument that he maintains was forfeited, and his perfunctory and undeveloped assertion that the City forfeited arguments by failing to comply with the procedural requirements of Rule 50(a) and (b) is itself forfeited. *See Wallace v. McGlothan*, 606 F.3d 410, 418–19 (7th Cir. 2017). Besides, a Rule 50(b) motion is not limited to the precise arguments made in the preverdict Rule 50(a) motion, but rather, a Rule 50(b) motion may raise only "grounds advanced in the preverdict motion." *Id.* at 418. The City's Rule 50(a) motion clearly made the argument that the evidence was legally insufficient to support a finding either that the City's policies caused Reiger and Serban to use unreasonable force against Bohanon, or that the City was deliberately indifferent to a known or obvious risk that its policies would cause its officers to use unreasonable force. (Trial Tr. vol. 2, 370, ECF No. 230.) These grounds fall within the scope of the Rule 50(b) motion.

### B. Failure to Train

The parties dispute whether Bohanon properly presented a failure-to-train claim to the jury. The City contends that he was not permitted to proceed on a failure-to-train claim. Bohanon counters that his statement of claims provided the City with

16

sufficient notice that his *Monell* claim based on excessive force encompassed his failure-to-train claim and that his failure-to-train claim was not precluded by the summary judgment entry.  The City has the correct position.

Bohanon's statement of claims does not assert a failure-to-train claim or even mention failure to train.  The summary judgment entry explains that "Bohanon's statement of claims sets forth claims based upon the officers' use of excessive force, unreasonable search and seizure, failure to intervene, and deliberate indifference to medical needs" but notes that his brief opposing summary judgment "focuses exclusively on his excessive force claim."  (Entry 16, ECF No. 127.)  While a failure to provide proper training may represent a policy for which a municipality can be held responsible under *Monell*, *see City of Canton v. Harris*, 489 U.S. 378, 390 (1989), in this case, such a claim did not advance past summary judgment.  The entry clearly provides the reason for the trial: "Genuine issues of material fact exist precluding summary judgment on Mr. Bohanon's excessive force *Monell* claim against the City." (Entry 22, ECF No. 127.)

Furthermore, at the final pretrial conference, the parties and the Court discussed whether there was a failure-to-train claim for trial.  The City contended that there was no such claim as it was not included within Bohanon's statement of claims nor permitted to proceed by the summary judgment ruling.  Bohanon had proposed jury instructions on the failure-to train claim, (Pl.'s Proposed Jury Ins. Nos. 9 & 11, ECF No. 184), and the City objected on the grounds that his statement of claims did not indicate he intended to prove a failure-to-train claim at trial and the Court's entry

did not allow such a claim to proceed to trial, (City's Objections to Pl.'s Proposed Jury Ins., Nos. 9 & 11, ECF No. 182).   Bohanon agreed with the City and withdrew his proposed instruction on failure-to-train.   (Entry and Order from Final Pretrial Conference 2, ECF No. 189.)   In addition, the Court granted the City's motion in limine in its entirety, and thus precluded any "reference, testimony, or argument that the City may be held liable for claims other [than] Plaintiff's *Monell* claim for excessive force injuries."   (City's Motion Limine 3, ECF No. 158; Entry and Order from Final Pretrial Conference 5, ECF No. 189.)

Moreover, at the final pretrial conference, the parties' joint case synopsis (ECF No. 177), which summarizes the parties' positions, was revised on agreement of the parties, (Entry and Order from Final Pretrial Conference 2, ECF No. 189) and then read to the jury in both voir dire and preliminary jury instructions, (Voir Dire Tr., 6, ECF No. 227; Trial Tr. vol. 1, 31–32).   The case synopsis says nothing about a failure to train.   (Final Pretrial Order, Ex. 2, Revised Case Synopsis, 1–2, ECF No. 189-2; Trial Tr. vol. 1, 31–32.)   And the jury was not instructed on a failure-to-train theory.   (Trial. Tr. vol. 3, 512–20.)   Based on this record, the Court finds that to the extent Bohanon presented and argued a failure-to-train claim at trial, such a claim was not before the jury.   Accordingly, the Court need not reach this issue.

### C.  Municipal Liability

The City can be held liable under § 1983 for the officers' unreasonable force used against Bohanon only if the City caused the deprivation of constitutional rights.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691–92 (1978).

18

Municipal liability under § 1983 does not attach based on vicarious liability. *Id.* at 692. A plaintiff seeking to establish § 1983 liability under *Monell* must first show that a municipal policy or custom caused the constitutional injury. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc); *see also King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 987 (7th Cir. 2020) ("[A] governmental entity cannot passively commit a Fourth Amendment violation."); *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc) ("The "critical question" under *Monell* is whether "the action about which the plaintiff is complaining [is] one of the institution itself, or is it merely one undertaken by a subordinate actor?"). A municipal action can have three forms: (1) an express policy, (2) a widespread custom or practice, and (3) an action by a final decisionmaker. *J.K.J.*, 960 F.3d at 377. In addition to demonstrating municipal action, the plaintiff must also "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)); *see also Monell*, 436 U.S. at 694 (explaining that only when a municipality's policy or custom "inflicts the injury" is the municipality responsible under § 1983). A municipality acts with the requisite culpability if its "action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan Cnty.*, 520 U.S. at 407. The plaintiff must demonstrate that the municipality was the "moving force" behind the constitutional injury. *Id.* at 404.

19

The parties agree that Reiger and Serban used unreasonable force against Bohanon on August 7, 2014. The issues are: (1) whether the City's policies, when enforced, caused them to use unreasonable force, (2) whether the City was deliberately indifferent to the likelihood that its policies would cause off-duty officers to use unreasonable force while having alcohol in their blood, and (3) whether the City's policies directly caused the violation of Bohanon's constitutional rights. The City moves for judgment as a matter of law, arguing (1) that there was no evidence that the City had a policy that caused Reiger and Serban to violate Bohanon's rights; (2) that there was no evidence that the City was deliberately indifferent to a known or obvious risk that its policies would lead to a constitutional violation; and (3) that there was no evidentiary basis for the jury to find that the City was the moving force behind the constitutional violations at issue in this case.

### 1. *Municipal Action*

The City argues that its express polices were not unconstitutional. (ECF No. 214 at 5.) Bohanon failed to respond to this argument. "Failure to respond to an argument generally results in waiver." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017); *see also Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (inferring from a party's failure to respond to a non-frivolous, dispositive argument that the party "acquiesces, rightly or wrongly" to that argument). Thus, the Court finds that Bohanon has waived any argument that the City's express policies were unconstitutional, which they are not. Indeed, the City's policies, specifically including General Order 1.30, expressly prohibited the use of unreasonable force, and

20

Reiger's and Serban's use of unreasonable force is the basis of Bohanon's constitutional claim.

The City next argues that General Order 3.24 prohibited Serban's and Reiger's actions and prohibited officers from going on-duty when they are under the influence of alcohol. (ECF No. 214 at 15–16.) The City maintains that the purposes of General Order 3.24 are "to ensure members are not under the influence of alcohol or other drugs while acting in any law enforcement capacity" and "to ensure 'officer and citizen safety while eliminating any question as to whether a member's judgment was impaired when the member performed a law enforcement function.'" (ECF No. 214 at 16 (citing General Order 3.24).) While Bohanon does not dispute the purposes of General Order 3.24, he argues that its "extreme emergency situations" exception has a number of gaps that allow for police action by off-duty officers with alcohol in their blood. He also argues that it is highly likely that these gaps will lead to the violation of rights like those he suffered. (Pl.'s Br. 8, ECF No. 220.)

General Order 3.24 does not allow off-duty officers to take police action involving the use of force to prevent injury to themselves or another person when they have been consuming alcohol. Although General Order 3.24 provides that off-duty officers "with alcohol in their blood are prohibited from performing any law enforcement function or taking self-initiated police actions except in extreme emergency situations where injury to the officer or another person is likely without law enforcement intervention," (Trial Ex. 7, 3), the general order expressly defines "law enforcement function" and "police action" to include "using physical force capable of causing bodily

injury, including deadly force, against any other person *except when necessary to pre-vent injury to the officer or another person*," (Trial Ex. 7, 2 (emphasis added)).  Thus, General Order 3.24 expressly excludes the use of "physical force capable of causing bodily injury . . . when necessary to prevent injury to the officer or another person" from the definition of "law enforcement function" and "police action."  Even though General Order 3.24 may not be a model of clarity, given its stated purpose "to ensure IMPD members are not under the influence of alcohol or other drugs while acting in any law enforcement capacity" and "to ensure officer and citizen safety while elimi-nating any question as to whether a member's judgment was impaired when the member performed a law enforcement function," (Trial Ex. 7, 1), no reasonable person could read General Order 3.24 as allowing Reiger and Serban to go on-duty while they had been drinking alcohol.  The Court concludes that General Order 3.24 did not allow off-duty officers with alcohol in their blood to perform a law enforcement action or take police action.

And to the extent General Order 3.24 allows off-duty officers who have consumed alcohol to use force against another person when necessary to prevent injury to them-selves or another person, the ability to use force in such situations is guaranteed by Indiana law.  As the City explains, it did not and cannot restrict officers' use of force authorized by Indiana Code 35-41-3-2 because Indiana law forbids the City from do-ing so.

Bohanon does not counter the City's argument that its policies provided Reiger and Serban with notice that their right to use force to protect themselves and others

was secured by Indiana law, Ind. Code 35-41-3-2, not the City's policies.  (ECF No. 214 at 11–12.)  Nor does he contest the City's argument that it could not restrict Reiger and Serban's authority to use reasonable force to protect themselves and others under Indiana law.[3]  (*Id.*)  The failure to contest these arguments is a forfeiture of any response Bohanon may have had.  *See, e.g.*, *Ennin*, 878 F.3d at 595.

Regardless, the City cannot be held liable for the deprivation of Bohanon's constitutional rights based on its policy of allowing its off-duty officers to follow state law and use reasonable force to protect themselves or a third person.  *See Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.").  Under *Monell*, a policy that enforces state law "simply cannot be sufficient to ground liability against a municipality."  *Id.* at 791–92.

Indiana law provides that "it is the policy of this state that people have a right to defend themselves and third parties from physical harm and crime."  Ind. Code § 35-41-3-2(a). "The purpose of [Indiana Code § 35-41-3-2] is to provide the citizens of this state with a lawful means of carrying out this policy."  *Id.*  Furthermore, under Indiana law, "[a] person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force."  *Id.* § 35-41-3-2(c).  And, "[n]o person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or

---

[3] As noted, that Reiger and Serban used unreasonable force is undisputed.

a third person by reasonable means necessary." *Id*.  Because the City lacked the authority to prohibit Reiger and Serban from using reasonable force under Indiana law, *see* Ind. Code § 35-41-3-2(c), the jury had no evidentiary basis to find that the City's policy or policies, or gaps in any of its policies, caused Bohanon's injuries from the officers' use of force.

Any gap in the authority that allows an off-duty officer who has been consuming alcohol to use his own judgment, as impaired as it may be, to determine if action is required to prevent injury to the officer or another person comes from Indiana law, not the City's policies.  In other words, state law, not the City's policies, permits an officer—intoxicated or not—to decide whether a situation allows intervention to prevent injury to the officer or another person.  Bohanon contends that the City made a choice by not implementing a zero-tolerance policy and is thus liable for allowing officers, who may be under the influence or even intoxicated, to intervene when they perceive an emergency situation.  (Bohanon's Br. 16, ECF No. 220.)  But as explained, the City could not, consistent with Indiana law, implement a zero-tolerance policy as Bohanon advocates.

Moreover, the evidence established that the City's policies are comprised of the general orders, rules, and regulations as a whole.  General Order 2.2 required IMPD officers to comply with all IMPD directives, including all general orders.  The City's policies taken as a whole prohibited Serban's and Reiger's unlawful conduct against Bohanon.  Despite the policy providing that they should have called an on-duty police officer to intervene in the situation when they, the off-duty officers had been drinking

alcohol, they did not do so, and they instead chose to take action. Serban took police action when he moved close enough to Bohanon so he would be able to use force against him and identified himself as a police officer by shoving his badge in Bohanon's face. And Reiger took police action in violation of the policies by engaging in a cover contact system or tactical "V" position when he had been drinking alcohol. Furthermore, the evidence established that both officers took police action when no extreme emergency situation existed. Thus, not even General Order 3.24, if read to allow them to take police action while drinking in the case of an extreme emergency situation, authorized them to take action when they first engaged with Bohanon. Reiger's and Serban's actions violated and frustrated the City's policies from the very beginning of their interaction with Bohanon. Also, it was this initial prohibited police action that gave rise to any arguable threat to the officers or anyone else in the bar. In short, if there even was an emergency exception to the order prohibiting police action, it was created by their own prohibited action rather than any policy. In any event, any credible threat of danger ended when Bohanon was rendered unconscious by the deadly chokehold, yet they continued to batter him long thereafter.

Besides, the City's polices, specifically General Order 1.30, authorized only the use of reasonable force, and it is undisputed that Reiger and Serban used unreasonable force and even used deadly force against Bohanon. Under General Order 1.30, the City's policy was to consider "the use of force in most instances to be defensive in nature and to be used only when necessary and justified to accomplish lawful objectives." (Trial Ex. 3, 1.) The evidence established that Serban's use of deadly force in

the form of a chokehold was neither necessary nor justified to accomplish a lawful objective.  For his part, Reiger assisted Serban's use of deadly force by holding Bohanon's legs and arm while Serban was applying the chokehold.  Likewise, the force used by Reiger and Serban in striking the unconscious Bohanon further and dragging him motionless out of the bar on his face was neither necessary nor justified to accomplish a lawful objective.  None of the City's policies allowed them to engage in these unreasonable uses of force.  Their use of unreasonable force violated the City's policies and therefore was not authorized.

Bohanon did not respond to the City's argument that the City's policies provided Reiger and Serban with adequate notice that it was criminal conduct to use deadly force in response to the situation they encountered at Mikie's Pub, (ECF No. 214 at 12–13), and he has therefore waived any argument that could have been raised in response.  And if the threat of criminal prosecution did not deter their use of unreasonable force, it is unclear that there was anything else that the City could do to deter their use of unlawful force against Bohanon.  *See, e.g.*, *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014).

The City is not liable for Reiger's and Serban's unauthorized acts under *Monell*: "Liability for unauthorized acts is personal; to hold the municipality liable, . . . the agent's action must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992).  Reiger's and Serban's use of unreasonable force against Bohanon and their other actions at Mikie's Pub violated and frustrated rather than adhered to the City's policies.  Therefore, the City may not be

held liable under *Monell* for those acts, and the City must be granted a judgment as a matter of law insofar as Bohanon's case is premised on express municipal action.

### 2. *Deliberate Indifference*

Yet, *Monell* liability may be based on inaction or gaps in a policy "in the face of obvious and known risks." *J.K.J.*, 960 F.3d at 378. A "'city's policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011)); *see also Glisson*, 849 F.3d at 382 ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan Cnty.*, 520 U.S. at 405.

As the Seventh Circuit recently said, "[t]he Supreme Court has made plain that a failure to act amounts to municipal action for *Monell* purposes only if the [municipality] has notice that its program will cause constitutional violations." *J.K.J.*, 960 F.3d at 379 (citing *Connick*, 563 U.S. at 61–62). Thus, "notice is essential to an ultimate finding and requires a 'known or obvious' risk that constitutional violations will occur." *Id.* at 379–80 (citing *Bryan Cnty.*, 520 U.S. at 410). Often times, "proof of a prior pattern of similar constitutional violations" will provide notice. *Id.* at 380. But where there is no evidence of such a pattern, there is another path to showing

municipal liability: "'[I]n a narrow range of circumstances,' deliberate indifference could be found when the violation of rights is a 'highly predictable consequence' of a failure to provide officers what they need to confront 'recurring' situations." *Id.* (quoting *Bryan Cnty.*, 520 F.3d at 409)).  In other words, where "the unconstitutional consequences of failing to [act]" are "so patently obvious," a municipality can be held liable even absent a prior pattern of such violations.  *Id.* (quoting *Connick*, 563 U.S. at 64).

The Court finds that the jury had a legally insufficient evidentiary basis to find that the City was deliberately indifferent to a known or obvious risk that its policies would likely lead to constitutional violations.  First, the stated purpose of General Order 3.24 was "to ensure members are not under the influence of alcohol or other drugs while acting in any law enforcement capacity" and "ensure officer and citizen safety while eliminating any question as to whether a member's judgment was impaired when the member performed a law enforcement function."  (Trial Ex. 7, 1.) The stated purpose reflects the City's interest in prohibiting officers under the influence from acting in any law enforcement capacity, ensuring officer and citizen safety, and prohibiting an officer from exercising impaired judgment when taking police action.  That is the opposite of deliberate indifference to a risk that General Order 3.24 would cause off-duty officers with alcohol in their blood to use unreasonable force against another person while engaging in police action.

Second, no evidence was presented at trial to suggest a prior pattern of similar constitutional violations.  The evidence establishes that the City had comprehensive

reporting requirements.  Bohanon did not contest the City's argument that General Order 1.30 set forth the City's policy requiring officers to call a supervisor to the scene of use-of-force incidents to investigate.  Nor did he contest the City's assertion that supervisors investigate uses of force to ensure compliance with City policies as well as state and federal law and to ensure that officers are not "violating people's rights." (ECF No. 214 at 14.)  Indeed, Lt. Eli McAllister testified that General Order 1.30 required officers to report all uses of force that exceed handcuffing non-resisting suspects to a supervisor.  (Trial Tr. vol. 3, 478.)  IMPD then used the reports to identify problems in the use of force and the frequency of occurrence.  In addition, General Order 3.12, which took effect in 2007, required off-duty officers to report any of their direct involvement in law enforcement or police action.  (Trial Ex. 6, 2.) And Bohanon did not respond to the City's argument that the City's policies required Reiger and Serban to "immediately report all violations" of the City's policies, procedures, rules, regulations and directives, regarding the use of force, to a supervisor.  (ECF No. 214 at 14–15 (citing Trial Ex. 3).)  Nor did Bohanon respond to the argument that the evidence established that the City analyzed these reports to identify whether its training and policies needed modifications.  (ECF No. 214 at 14–15.)  Indeed, the evidence presented at trial established that the City's policies required officers to report all violations of its policies, etc. regarding the use of force and IMPD used the reports to identify deficiencies in policy and training.

Bohanon did not counter the City's argument that he admitted no evidence that suggested the City knew or should have known that its reporting requirements and

supervisor investigations of use-of-force incidents would fail or had failed so often that they would obviously result in a violation of his rights.  (ECF No. 214 at 31.) Indeed, no evidence was presented at trial to suggest that the City was aware of or had any reason to know of any deficiencies in its policies, or even training, that were likely to result in its officers using excessive force when they were drinking alcohol while off duty.  No evidence was presented to suggest that the City knew there was a substantial risk that its use-of-force policy, its substance abuse policy, or any other policy would cause or, for that matter, allow officers to violate another person's constitutional rights.  There was no evidence of a pattern or series of similar incidents prior to the incident with Bohanon on August 7, 2014.

Third, Bohanon adduced no evidence that the unconstitutional consequences of failing to act were "so patently obvious," *J.K.J.*, 960 F.3d at 380 (quoting *Connick*, 563 U.S. at 64), that the City can be held liable without a prior pattern relevant violations.  As the Supreme Court has said, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . .  [W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality,[7] and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (footnotes omitted).  The incident involving Reiger's and Serban's use of unreasonable force against Bohanon appears to have been the first

such incident since General Order 3.24 had taken effect approximately three and one-half years before.  At the least, the evidence established that it was the first and only such incident of which the City had notice.  Nor was there any evidence that the need for more or different policies was patently obvious or likely to result in the violation of citizens' constitutional rights.

The jury had no evidence from which to find that the use of unreasonable force against another person by off-duty officers who had been drinking alcohol was a "highly predictable" consequence of the City's use-of-force and substance abuse policies.  Bohanon did not contest the City's assertion that there was no evidence to establish that intoxicated officers are "far more likely to use greater force than necessary in a physical engagement."  (ECF No. 214 at 24.)  By failing to respond to this argument, Bohanon has waived any response he could have made.  *See, e.g.*, *Ennin*, 878 F.3d at 595.  In any event, no such evidence was presented at trial, and no evidence was presented to prove that Reiger and Serban were intoxicated at the time of the incident.  Rather, the evidence was that Reiger and Serban were not intoxicated when they used force against Bohanon.  (*See* Trial Tr. vol. 2, 183–84 (Serban), 233 (Reiger).)  Therefore, no reasonable jury could find the City liable under a deliberate-indifference theory.

### 3. Direct Causal Link

Finally, to prevail under *Monell*, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *J.K.J.*, 960 F.3d at 377 (quoting *Bryan Cnty.*, 520 U.S. at 404).  This means that the plaintiff

must demonstrate that the municipality was the "moving force" behind the constitutional injury. *Bryan Cnty.*, 520 U.S. at 404. Serban testified that his decision to intervene and take police action was caused by Bohanon escalating the situation. (Trial Tr. vol. 2, 183.) Reiger believed he was obligated to intervene in the scuffle between Serban and Bohanon to prevent injury to Serban, (*id.* at 222–23), and Reiger was willing to take a write-up for his actions, (*id.* at 247, 253). Reiger further justified his actions by explaining that if Serban had been wearing a gun and Bohanon got a hold of it, the gun could have killed them all. Thus, Reiger justified his use of force on the perceived threat of imminent injury to himself and others. As a result, his actions were based on his understanding of Indiana law, as previously detailed above, not the City's policies. Consequently, Bohanon's injuries would not have been avoided even if the City had different policies. The City's policies were not the "moving force" behind Reiger's and Serban's use of unreasonable force against Bohanon or his injuries.

## Conclusion

While the Court has great sympathy for Bohanon and the harm he suffered, the City's policies did not give "rise to the harm" as required under *Monell*; rather, "the harm resulted from the acts of the [City's] agents." *See Glisson*, 849 F.3d at 379. The City's Motion for Judgment as a Matter of Law (ECF No. 213) is **granted**. The City's Motion for New Trial or to Amend Judgment (ECF No. 215) is **denied as moot**. Plaintiff's Motion for Award of Attorneys' Fees and Expense (ECF No. 204) and

Plaintiff's Motion for Supplemental Award of Attorney's Fees (ECF No. 240) are **denied as moot**.

SO ORDERED.

Date: 9/30/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to all registered counsel of record